IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 2, 2023

FILED
JAN 10 2024
Clerk of the Appellate Courts
REc'd By _____

**IN RE SEBASTIAN O.**

**Appeal from the Juvenile Court for Johnson City**
**No. 44340    Sharon M. Green, Judge**

_____

**No. E2023-00439-COA-R3-PT**

_____

Mother appeals the termination of her parental rights based on Tennessee Code Annotated section 36-1-113(g)(14). Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JEFFREY USMAN, J., joined.

Kristen E. Rudder, Johnson City, Tennessee, for the appellant, Jennifer B.

Jerry J. Fabus, Jr., Johnson City, Tennessee, for the appellees, Andrea O. and Shawn O.

**OPINION**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

On September 8, 2022, Petitioners/Appellees Shawn O. ("Grandfather") and Andrea O. ("Grandmother," and together with Grandfather, "Petitioners") filed a petition to terminate the parental rights of Respondent/Appellant Jennifer B. ("Mother") to her child Sebastian Z.O., born in May 2018.[1] The petition was filed in the Johnson City Juvenile Court ("the trial court"). According to the petition, Petitioners are the maternal grandmother and step-grandfather of the child and had obtained custody of him in a prior dependency and neglect proceeding. The petition alleged as grounds as to Mother: (1) persistence of conditions; and (2) failure to manifest a willingness and ability to parent

_____

[1] In cases involving the termination of parental rights, it is this Court's policy to remove the full names of children and other parties, to protect their identities.

the child.[2]

A hearing on the termination petition was held on January 9, 2023. At the start of the hearing, the trial court ruled that Mother would be allowed to file an answer to the petition, over the objection of Petitioners. Court took a brief recess, and Mother, by and through counsel, promptly filed an answer to the petition, denying that there were grounds to terminate her parental rights or that termination was in the child's best interest. When court resumed, Petitioners asked that the answer be stricken because the answer was not signed by Mother nor sworn to or verified as required by Tennessee Code Annotated section 36-1-117(o).[3] The trial court granted the motion to strike the answer and to allow Petitioners to proceed by default. After Petitioners rested their case, however, the trial court reconsidered its ruling due to the fundamental rights at stake. So Mother's counsel was allowed to question Petitioners' witness and to present her own proof.

Grandmother and Mother were the only witnesses. Grandmother testified that when the child was born,[4] Mother was living in a halfway house, but then moved in with Petitioners in an apartment attached to their home. Grandmother testified that the child was mostly living with her and Grandfather due to Mother's "level of problems" during that time. Mother would go two or three days at a time without seeing the child at all. Grandmother testified that Mother's mental health challenges included anxiety, depression, and bipolar disorder, for which Mother is prescribed medication. Grandmother also believed that Mother was seeing a professional for "sessions" and that they were looking into whether Mother had borderline personality disorder.

The proceedings that ultimately resulted in Petitioners having legal custody of the child are somewhat unclear. According to Mother, she initially agreed under duress to allow Petitioners custody of the child. Later, in July 2020, Petitioners filed a dependency and neglect action against Mother. Mother then stipulated to a finding that the child was dependent and neglected and that Petitioners should be awarded physical and legal custody of the child. The trial court entered an order finding the child dependent and neglected and placing him in Petitioners' custody on May 11, 2021.[5] Mother was granted supervised visitation a minimum of once per week as a result of that proceeding. The order provided that Mother could petition for custody of the child if she completed some tasks, including providing "proof of ongoing participation and progress in the Families Free program, proof of compliance with mental health treatment, and proof of stable housing and income

---

[2] The petition also raised grounds for termination as to the child's putative father. The child's father is not at issue in this appeal.

[3] Section 36-1-117(o) provides that "[t]he response or answer to a petition for termination of parental rights shall be signed by the respondent personally, sworn to and verified, and filed with the clerk of the court."

[4] The child spent some time in the neonatal intensive care unit following his birth.

[5] The final order of dependency and neglect stated only that the child was removed because Mother was "unable to provide complete care for the child at this time."

sufficient to support herself and the minor child, and that return of custody would be in the best interests of the minor child." Although the order of dependency and neglect was entered only about nineteen months prior to the termination trial, Grandmother testified that the child had actually been in Petitioners' custody for about two-and-one-half years by the time of trial.

After the termination petition was filed, Grandparents also took custody of Mother's later-born child, who was not at issue in this proceeding. Grandmother testified that the younger child was dropped off to them by the Tennessee Department of Children's Services because Mother was in jail. Grandparents were given a diaper bag with some clothes, but the clothes were all dirty and covered in vomit. Grandparents had to purchase clothes and formula for the younger child. The diaper bag also contained DNA testing indicating the father of the younger child. The younger child was then placed in his father's custody.[6]

Grandmother testified that Mother is unemployed but collects disability. Over the years that the child has been in Petitioners' custody, Mother never provided financial support for the child but only small gifts of a T-shirt, a pair of socks and "maybe got a lunch at a visitation[.]" The dependent and neglect order did not specifically order Mother to pay child support.

Grandmother further testified that she has "no idea" where Mother is residing. And Grandmother testified that Mother had never provided any indication that she had completed the tasks set for her to resume custody of the child. Indeed, Grandmother testified that Mother's circumstances were actually worse than when Petitioners first assumed custody.

Much of the testimony concerned Mother's visitation. Visits were initially supervised by the Tennessee Department of Children's Services ("DCS") and took place at Mother's apartment. After DCS closed its case, Grandmother supervised the visits and they took place first at Petitioners' home, then at a mall. Mother testified that the visits went well initially and that she believed that she was ready to start reintegrating the child into her home. So Mother filed a petition to increase her visitation and for contempt in April 2022.[7]

Grandmother disagreed that the visits went well for the child. According to Grandmother, the child was slow to warm up to Mother during visits and acted anxious, but he did eventually warm up to Mother. By the end of the visit, however, the child would ask if it was time to leave. Moreover, Grandmother testified that Mother often failed to

---

[6] No testimony as to the younger child's current whereabouts was offered at trial.

[7] The petition is not in the record, and the parties did not discuss at trial the contempt allegations. As such, the basis for the contempt petition is unclear.

- 3 -

appear for the scheduled visits. Grandmother testified that when Mother missed visits, the child would be "greatly distressed", causing him to be anxious, to cry, and to express that he did not want to continue the visits. But she nevertheless continued to force the child to attend the visits due to the court order requiring visitation. Mother admitted that she didn't inform Grandmother that she would not attend visits, but claimed that this was a regular practice by both parties.

An incident also occurred at what turned out to be Mother's last visit with the child in May or June 2022. Specifically, Mother and Grandmother argued about whether the child should sit outside on the ground. Grandmother testified that Mother yelled at her and grabbed the child away from her. Mother eventually returned the child to Grandmother but continued yelling. The scene caused the child to cry and claim that he hated Mother because she was mean and rude. Later that evening, the child also cursed in the same manner that Mother had during the altercation.

Then Mother stopped attending the visits altogether. Mother claimed that she had not participated in visitation leading up to that hearing because of the "fighting and arguing" with Grandmother. As evidence of the animosity, Mother testified that Grandmother was once watching Mother's younger child and would not return him; Mother testified that she had to call "law enforcement to help me get my son back home." As a result of Mother repeatedly missing visitation, Petitioners filed a motion seeking to suspend Mother's visitation completely.

A hearing on both pending motions occurred on September 8, 2022, but Mother failed to appear for the hearing.[8] Grandmother testified at the hearing. The trial court entered an order disposing of the motions on September 13, 2022. Therein, the trial court found that Mother had exercised only a single visitation with the child since May 14, 2022.[9] According to the order, Mother would often confirm the visit and then cancel at the last minute causing the child to wait for Mother at the visitation location. The trial court found that Mother's actions "had a very upsetting effect" on the child. Frequently after Mother failed to appear at the visitation the child would wake up in the middle of the night that night with a nightmare. The trial court therefore dismissed Mother's petition for increased visitation and contempt for failure to prosecute. The trial court granted Petitioners' motion to suspend all of Mother's visitation until further order of the trial court.

Grandmother gave her opinion that returning the child to Mother would be detrimental to him, as the child had been thriving in the care of Petitioners. Grandmother further explained that a return to Mother would be devastating emotionally and physically to the child, given that the child has no secure and healthy attachment to Mother. The child

---

[8] Mother testified that she was late to the hearing by several hours because she had to travel from another town. But she admitted that she had notice of the time of the hearing.

[9] The testimony at trial was that the last visit occurred in May or June 2022.

has a support system with Petitioners and their extended family. The child calls Mother "Mommy," but once recently referred to Mother by her first name. The child now refers to Petitioners as "Mom" and "Dad."

Much of Mother's testimony focused on her living situation. Mother testified that she was currently living in an extended-stay hotel, but that she was on a waiting list for government housing. Mother also testified that was recently working at Burger King, but that she has not been working due to the flu. She receives around $800.00 to $900.00 per month in supplemental social security income ("SSI"). Mother admitted that in all of 2022, she only worked about seven or eight weeks; she testified, however, that she was unable to work due to issues outside her control, such as her high-risk pregnancy with her younger child. Mother agreed that she had not given any cash to Petitioners for the child's care, but testified that when she asked if the child needed things, Petitioners responded that he did not. Mother also testified that she had spent "a lot of money" on gifts for the child, such as clothes and diapers.

When Mother lived with Petitioners in their attached apartment, she paid them between $350.00 and $500.00 per month in rent; Mother noted that this was less than they would have charged a regular tenant. Mother also asserted that she was the child's primary caregiver during this time. But Mother admitted that Grandmother would care for the child when she returned to work. Mother also admitted that she agreed to grant Petitioners custody of the child because she was having "a small mishap with substance abuse issues." According to Mother, Petitioners threatened to call the police if Mother did not agree to grant them custody. At some point, Mother moved from Petitioners' home to an apartment.

Mother also testified about her efforts regarding drug and mental health treatment. Mother testified that she most recently attended Families First beginning a couple of weeks prior to trial; Mother had attended two sessions before getting sick. Mother testified that she had participated in Families First "numerous times." But she admitted that she had never completed the program.

Mother also testified that she is receiving mental health treatment at Frontier Health, which provides counseling, therapy, and medication management.[10] According to Mother, she has gone to Frontier Health on and off for her entire adult life, but she has only been on her current medication regime since September 2022; Mother testified that she takes three separate medications for depression and anxiety. Although Mother testified she was on other medications prior to September 2022, she could not remember any of their names. Frontier Health also placed Mother in an intensive outpatient program that she attended "for a little while."

---

[10] Mother did not testify that she participated in all of Frontier Health's services; the only service she specifically stated she was seeking there was related to medications.

Mother further testified that she has not used illegal drugs for a year "maybe closer to two." Mother admitted, however, that she did use illegal drugs prior to Petitioners filing the dependency and neglect petition. A nail drug test performed on October 22, 2020, indicated that Mother was positive for amphetamine, methamphetamine, and tetrahydrocannabinol ("THC").[11] On cross-examination, Mother admitted that she had never provided Petitioners or the court any documentation that she was seeking drug or mental health treatment.

Mother admitted that at the time that her younger child was placed with Petitioners, she was jailed due to slapping her then-live-in boyfriend during a fight. Mother admitted that the environment was not appropriate for her younger child because she and the boyfriend were always verbally fighting. But Mother was no longer living with the boyfriend and a no contact order was put in place by the State. The charges relating to that incident were still pending at the time of trial. Mother testified that she was eligible for diversion on that charge. Mother has around $200.00 in her bank account, no car, and no driver's license. She uses public transportation.

The trial court entered a detailed order granting Petitioners' petition for termination of parental rights on February 27, 2023. Therein, the trial court ruled that Petitioners failed to demonstrate that the ground of persistence of conditions was applicable in that the proof was unclear as to whether the child was removed from Mother after the filing of a dependency and neglect petition.[12] The trial court found, however, clear and convincing evidence that Mother failed to manifest a willingness and ability to parent the child and that placing the child in Mother's custody would pose a risk of substantial harm to the child. Finally, the trial court found that termination was in the child's best interest.[13]

## II. ISSUES PRESENTED

In this appeal, we resolve the two questions posed by Mother: (1) whether the trial court erred in finding clear and convincing evidence to support the willingness and ability

---

[11] "THC is a marijuana metabolite that is stored in fat cells and can be detected in the body up to thirty days after smoking marijuana." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 677 (Tenn. 2007).

[12] The trial court made additional findings as to the other elements of the persistence of conditions ground in the event that its legal conclusion as to the ground's applicability was reversed on appeal. Because Petitioners have not appealed that ground, we need not address those additional findings. *See In re Sydney B.*, 537 S.W.3d 452, 456 n.8 (Tenn. Ct. App. 2017) ("The Tennessee Supreme Court in *In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016), ruled that this Court must consider all of the grounds found by the trial court, 'regardless of whether **the parent** challenges these findings on appeal.' The rule adopted in *Carrington* has never been construed to require this Court to also consider the grounds not sustained by the trial court and thereafter appealed by the non-parent. Accordingly, we will only consider the ground appealed by Appellants in this case." (internal citation omitted)).

[13] The trial court designated its ruling as to Mother as a final judgment under Rule 54.02 of the Tennessee Rules of Civil Procedure.

ground for termination; and (2) whether the trial court erred in finding clear and convincing evidence to support the finding that termination is in the child's best interest.

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521 (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (quotation marks and citations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." *In re S.R.C.*, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

Because of the high standard of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court recently explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence

- 7 -

preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

## IV. ANALYSIS

### A. Ground for Termination

In this case, the trial court found only a single ground for termination under Tennessee Code Annotated section 36-1-113(g)(14), which provides as follows:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). The ground contains two distinct elements that must be proven by clear and convincing evidence. The first requires proof that Mother has failed to evince either her ability or her willingness to assume custody of the child. *In re Brylan S.*, No. W2021-01446-COA-R3-PT, 2022 WL 16646596, at *8 (Tenn. Ct. App. Nov. 3, 2022) (citing *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020)). The second requires proof that placing the child in Mother's custody poses "a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).

- 8 -

In support of its finding that Mother failed to manifest the willingness and ability to assume physical custody, the trial court noted that Mother never completed the steps required to return custody of the child to her, such as providing proof of progress in the Families First Program, providing proof of ongoing mental health treatment, or providing proof of stable housing and employment. The trial court further found that Mother failed to consistently take advantage of the visitation awarded to her and was not currently residing in a stable home. With regard to financial responsibility, the trial court found that Mother had never paid more than token support for the child and even if Mother had been willing to pay support, her income barely exceeds her expenses, leaving her with little income to support the child.

On appeal, Mother argues that the trial court erred in finding that her housing was not appropriate, as no proof was offered that her extended-stay hotel was not safe. Moreover, Mother points to her testimony that she has been approved for public housing and that her housing challenges are the result of COVID-19 rather than her own mistakes. Mother also points out her undisputed testimony that she was no longer abusing drugs and that she has employment. Moreover, Mother asserts that her testimony indicates that Petitioners refused her offers of child support, Petitioners never asked Mother for child support, and no order requiring Mother to pay support was ever entered.

We agree with the trial court that Mother has failed to manifest the willingness and ability to assume physical custody of the child or financial responsibility for the child. "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome the obstacles" preventing the parent from assuming custody. *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). Here, the trial court gave Mother concrete steps to perform in order to regain custody of the child. These steps were not unreasonable given Mother's admitted drug use during the time of the dependency and neglect proceeding. Mother admitted that she never completed the Families First or a similar program. And Mother never provided the court or Petitioners with any proof that she was consistently seeking mental health treatment; by her own admission, Mother's current pharmaceutical treatment regime only began four months prior to trial, while the child had been in Petitioners' care for over two years. Mother could not recall what she had been prescribed to treat her mental health disorders in the past. Mother also admitted that she entered into a relationship that turned out to be toxic and that she slapped her boyfriend in September 2022, resulting in an unresolved domestic assault charge. And while Mother's residence at an extended-stay hotel may not be unsafe, it is certainly not evidence of stability. So then, Petitioners have presented clear and convincing proof that Mother has failed to manifest the willingness and ability to assume physical custody of the child.

Mother also failed to pay any child support for her child, and only provided token gifts for the child consisting of some clothes and diapers. While Mother was never ordered

- 9 -

to pay a specific amount of support, the lack of order is no defense to Mother's failure to pay any support. *See In re Brookelyn W.*, No. W2014-00850-COA-R3-PT, 2015 WL 1383755, at *11 (Tenn. Ct. App. Mar. 24, 2015) ("[A] parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support." (citing *In re Shandajha A.G.*, No. E2012-02579-COA-R3-PT, 2013 WL 3787594 (Tenn. Ct. App. July 17, 2013))). And while Petitioners turned down Mother's non-specific offers to provide items for the child, nothing in her testimony indicates that Petitioners ever actively prevented Mother from supporting the child.

Mother also never asserted that she was unable to pay any support. However, the trial court expressed concern that Mother's rent alone consumed her SSI payments. Although Mother could supplement her SSI income with employment, it appears that Mother only worked sporadically in the year prior to trial. On the whole, we cannot conclude that the trial court erred in concluding that Petitioners presented clear and convincing proof that Mother failed to manifest either the willingness or the ability to assume financial responsibility for the child.

Next, we consider whether Petitioners have proven that placing the child in the parent's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). We have previously explained that the circumstances that pose a risk of substantial harm "are not amenable to precise definition because of the variability of human conduct." *In re Greyson D.*, No. E2020-00988-COA-R3-PT, 2021 WL 1292412, at *8 (Tenn. Ct. App. Apr. 7, 2021) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). But the modifier "substantial" indicates that the risk must be both "a real hazard or danger that is not minor, trivial, or insignificant[,]" and "more than a theoretical possibility." *Id.* (quoting *Ray*, 83 S.W.3d at 732).

In finding a likelihood of substantial harm, the trial court focused first on Mother's visitation with the child. The trial court noted that Mother failed to take advantage of all of the visits with the child and that she was so unruly at the last visit in May or June 2022, that she caused the child to be emotionally upset. The trial court also noted that Mother provided no proof that she was consistently addressing her mental health needs and that she "has not testified that she is currently participating in mental health services other than medication management." And the trial court noted that Mother had attempted the Families First program multiple times, but never completed it. So then, Mother had not submitted proof that she had completed any of the requirements that the trial court set forth for her to regain custody. Mother also has pending criminal charges for domestic assault.

In contrast, the trial court noted that the child has resided in a safe, stable home with Petitioners for over two years at the time of trial. According to the trial court, the child is "flourishing" in Petitioners' care. So the trial court found that "to disrupt the child from his secure, loving placement with his grandparents in the home where he has lived all of his life and placing the custody of the child with Mother would pose a risk of substantial harm

- 10 -

to the physical or psychological welfare of the four year old child."

Mother does not specifically address the second prong of this ground in her appellate brief. Regardless, after our review, we agree with the trial court. While this Court has held that forcing a child to reunite with a virtual stranger can constitute substantial harm for purposes of this ground, *see In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021), we have also held that "[r]emoval of a child from foster parents that the child has been living with for a long time and may have bonded with does not constitute substantial harm." *In re Nakayia S.*, No. M2019-00644-COA-R3-PT, 2020 WL 4558376, at *8 n.6 (Tenn. Ct. App. Aug. 7, 2020) (quoting the father's argument) (citing *In re Alysia S.*, 460 S.W.3d 536, 576–77 (Tenn. Ct. App. 2014)). In this case, Mother is not necessarily a stranger to the child, but she has put so little effort into her relationship with the child as to be little better. Here, Mother was granted limited visitation with the child, but often refused to appear for the visitation with no notice to the child. Mother's actions meant the child was waiting for a parent who never appeared, causing the child considerable anxiety and distress. The last visit that Mother attended, she became so belligerent that it caused the child to cry. And while Mother filed a petition to increase her visitation, she failed to timely appear for the hearing without real justification. These actions indicate that Mother refuses to put the child's well-being before her own desires.

Mother's lack of progress on the steps that the trial court asked her to complete is also concerning. Mother does not argue that these requirements were unreasonable or unrelated to the issues that caused the child to be placed in custody. Even after over two years in Petitioners' legal custody, Mother failed to provide either the trial court or Petitioners anything other than her unsupported assertions that she was consistently seeking mental health treatment. Mother also minimized her past drug use and had repeatedly failed to complete the Families First drug treatment program. Mother's housing situation is also somewhat unstable, as she was living in an extended-stay hotel after having to leave her residence with her boyfriend due to a violent altercation. This violence apparently occurred when Mother had custody of her later-born child, and he was removed as a result of the criminal charges Mother incurred due to this incident. Those criminal charges were still pending at the time of trial.

In contrast to Mother's lack of effort on behalf of the child, Petitioners have cared for the child for the majority of his life. Indeed, even before Petitioners were granted legal custody of the child, they were central figures in his care. Thus, given his young age, Petitioners are the only real caregivers that the child has ever known. And the testimony was that it would be detrimental for him to be removed from Petitioners' care. On the whole, it does appear that Mother has exhibited such little concern for the child's mental well-being and stability that she likely poses a threat of substantial harm to the child. We therefore affirm the trial court's finding that a failure to manifest a willingness and ability to assume physical custody is a ground for termination of Mother's parental rights.

- 11 -

## B. Best Interest

Because we have determined that at least one statutory ground for terminating Mother's parental rights has been proven, we must now decide if Petitioners have proven, by clear and convincing evidence, that termination of Mother's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). The factors that courts should consider in ascertaining the best interest of a child include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
(F) Whether the child is fearful of living in the parent's home;
(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;
(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;
(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;
(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

- 12 -

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i).

Determining a child's best interest does not entail simply conducting "a rote examination" of each factor and then totaling the number of factors that weigh for or against termination. *In re Audrey S.*, 182 S.W.3d at 878. Instead, the "relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *White*, 171 S.W.3d at 194). Moreover, "courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d at 878). Thus, "[w]hen the best interest of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child." Tenn. Code Ann. § 36-1-101(d).

We look first to those factors related to the child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability), (B) (involving the effect of a change in caretakers on the child's well-being), (D) (involving the security of the parent-child attachment), (E) (involving visitation), (H) (involving the

child's attachment to another parent-figure), (T) (involving the effect of the parent's mental and emotional fitness on the child). The trial court found that each of these factors weighed in favor of termination, citing Mother's lack of stability compared to Petitioners, Petitioners' consistent care of the child throughout his life, the child's attachment to Petitioners, Mother's inconsistent visitation, Mother's actions during visitation that caused the child distress, and the child's resulting lack of attachment to Mother. The trial court found, however, that factor (I), concerning the child's relationships with others, did not support termination, because Mother's family and heritage was Petitioners' family and heritage.

We generally agree. Here, Mother's own decisions to forgo consistent visitation with the child and act aggressively during visitation have caused the child distress. Although the child knows Mother as his parent, he has also begun to refer to Petitioners as "Dad" and "Mom," unprompted, indicating that he views Petitioners as his true caregivers. This is unsurprising because Petitioners have been his caregivers for the majority of his life, as Grandmother was very involved in his care even before the dependency and neglect action. The trial court was also not unfounded in its concern over Mother's mental health issues, as Mother had never provided the proof necessary of consistent treatment that had previously been required for Mother to regain custody. And the trial court noted that Mother's choice to throw a tantrum during visitation "demonstrated [Mother's] lack of emotional control." As such, we agree that these factors favor termination.

Next, we address those factors involving the physical environment of the child and the parent. *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being in the parent's home), (N) (involving any abuse or neglect present in the parent's home by the parent or others residing there), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home). The trial court's findings as to these factors was mixed. Specifically, the trial court found that the child had never expressed fear of Mother's home, no other people lived with Mother, and there was no evidence of trauma to the child. We agree that factors (F), (G), and (N) do not favor termination.[14]

The trial court found, however, that the proof indicated that Mother had never truly provided safe and stable care to the child as even when the child was in Mother's legal custody, Grandmother provided considerable care for the child. And during this time,

---

[14] As to these factors, the trial court states variously that they are inapplicable due to a lack of proof or that they do not favor termination. The failure to submit proof as to a factor "does not necessarily mean that the factor is inapplicable," but often means that the petitioning party failed to demonstrate that the factor weighs in favor of termination. *In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at *14 (Tenn. Ct. App. Oct. 31, 2023) (collecting cases).

Mother admittedly developed a drug problem that prevented her from caring for the child. Moreover, the trial court also once again questioned the safety and stability of Mother's living situation, as well as Mother's apparent lack of commitment to parenting as evidenced by her inconsistent visitation.

We agree that the proof indicates that Grandmother has been the central caregiver for the child as a result of Mother's unwillingness or inability to parent the child. Indeed, even when Mother had another chance to parent her later-born child, that child was removed due to Mother's decision to engage in criminal conduct. Those charges remained unresolved at the time of trial. Mother's current living situation is also somewhat precarious and not a proper place to which the child could return. Although Mother has hope of being placed in public housing, the trial court noted that "the child's life cannot stand still and wait" for the conditions in Mother's life to be ready for him to return to her, particularly given that he has a safe and stable home now. As such, we agree that factors (O), (Q), and (R) favor termination.

We next turn to those factors concerning the efforts made by the parent. *See* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (M) (involving the parent's sense of urgency), (P) (involving the parent's understanding of the child's basic needs).[15] The trial court found all of these factors favored termination, again citing Mother's failure to complete any of the actions that she was required to complete before seeking a return of custody in the over two years since the dependency and neglect order. Indeed, Mother admitted that she had attempted the Families First program on a number of occasions, but had never successfully completed the program in the year-and-a-half since the April 2021 order. As the trial court correctly found, Mother has failed to exhibit any sense of urgency in completing the tasks necessary to reunify with her child. Instead, in the months before trial, she incurred a new criminal charge, which remained pending at the time of the termination hearing. The trial court further noted that Mother has done nothing to meet the child's needs since April 2021; rather, the consistent caregiver for the child for the majority of his life has been Grandmother. Thus, the trial court correctly concluded that these factors favor termination.

The final factor involves "[w]hether the parent has consistently provided more than token support for the child." Tenn. Code Ann. § 36-1-113(i)(S). The trial court essentially found that Mother had not provided more than token support for the child. The record supports this finding. Here, Grandmother testified that Mother never paid support for the child other than a few token gifts over the years.[16] And while Mother testified that she

---

[15] Among these factors is also factor (L), involving DCS's reasonable efforts to assist the parent. The trial court found that this factor was inapplicable because the child was never in DCS custody. Neither party disputes this finding. It does appear that DCS assisted Mother in supervising some visits, but eventually closed its case.

[16] The trial court specifically found Grandmother to be credible.

- 15 -

offered "certain things" for the child that Petitioners declined, she did not testify that Petitioners actually prevented her from providing support for the child. So this factor also favors termination.

On the whole, the majority of the factors in this case support termination of parental rights. While determination of the child's best interest may not be reduced to a simple tallying of the factors for and against termination, *see In re Audrey S.*, 182 S.W.3d at 878, especially considering the similarities between the factors, we cannot help but acknowledge the overwhelming sense that the child's life will not be improved by a reintroduction to Mother. Here, the child has a safe, stable home where he is well cared for and with caregivers whom he has come to consider his parents. In contrast, the proof leaves substantial doubt that Mother can provide a safe, stable home for the child where his needs are met. And Mother's own actions have reduced her to little more than a stranger to her child. Under these circumstances, the trial court did not err in concluding that termination of Mother's parental rights was in the child's best interests.

## V. CONCLUSION

The judgment of the Johnson City Juvenile Court is affirmed, and this cause is remanded for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant Jennifer B., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE